Jack Starr v. Commissioner. Samuel M. Starr v. Commissioner.
Starr v. Commissioner
Docket Nos. 30584, 30590.
United States Tax Court
T.C. Memo 1958-50; 1958 Tax Ct. Memo LEXIS 180; 17 T.C.M. (CCH) 253; T.C.M. (RIA) 58050; March 31, 1958
*180 1. During 1943 and 1944, petitioners and their brother Joseph were members of a partnership called Starr Pen Company. Petitioners each had a 15 per cent interest and Joseph a 70 per cent interest in the partnership. The business of the partnership was that of selling fountain pens and sets of pens and pencils at wholesale. Joseph did all of the selling for the partnership. During 1943, he sold on behalf of the partnership large quantities of pens and sets to another partnership referred to herein as K.L. & M. During 1943, K.L. & M. paid for such merchandise a total of $242,298.80 in cash in addition to the regular invoice price, which invoice price was always paid by check. No part of this $242,298.80 was entered on the books of Starr Pen Company or returned as income by petitioners. All but $12,000 of this amount was paid direct to Joseph. The said $12,000 was handed to Samuel to be delivered to Joseph. Upon the facts, it is held: (a) that the $242,298.80 was received by Joseph and Samuel on behalf of the Starr Pen Company; (b) that the $242,298.80 was income of the Starr Pen Company; (c) that $66,448.80 of the $242,298.80 accrued to the partnership during its accounting period *181 ended June 30, 1943; (d) that $175,850 of the $242,298.80 accrued to the partnership during its accounting period ended January 31, 1944; and (e) that there should be included in the income of each petitioner 15 per cent of $66,448.80 in 1943 and 15 per cent of $175,850 in 1944. 2. Held, petitioner Jack Starr has failed to prove that any error relating to salaries was committed either by himself in his return filed for 1943 or by the respondent in his determination that petitioner's salary from Starr Pen Company for the years 1943, 1944, and 1945 amounted to $3,000, $4,600, and $2,400, respectively. 3. Petitioners made loans to a partnership called Four Starr Manufacturing Company. Petitioners were not members of this partnership. The loans became worthless in 1945. Held, respondent did not err in determining that the losses resulting from the loans were nonbusiness bad debts and were deductible by petitioners only to the extent provided in section 23(k)(4), I.R.C. 1939. Isaac I. Bender, Esq., for the petitioners. George T. Donoghue, Jr., Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: In these consolidated proceedings respondent determined deficiencies in income taxes and has made claim for increased deficiencies in income taxes as follows: Jack Starr, Docket No. 30584
Taxable
Total Deficiency
Year Ended
Deficiency
as Increased
Dec. 31, 1943
$ 6,718.19
$ 6,792.89
Dec. 31, 1944
66,931.49
67,769.46
Dec. 31, 1945
10,381.03
No increase
Samuel M. Starr, Docket No. 30590
Dec. 31, 1943
$ 7,378.16
$ 7,481.11
Dec. 31, 1944
64,904.45
65,742.42
Dec. 31, 1945
1,129.58
No increase
*183 Many of the issues raised by the pleadings have either been waived or withdrawn. The issues still contested are: (1) Whether, during its accounting periods ended June 30, 1943, and January 31, 1944, there accrued to Starr Pen Company, a partnership, gross income in the amounts of $66,448.80 and $175,850, respectively, which was not reported; (2) whether respondent erred in determining that there should be added to Jack's distributive share of the partnership, Starr Pen Company, organized on February 1, 1943, salaries in the amounts of $3,000, $4,600, and $2,400 for the accounting periods of the partnership ending on June 30, 1943, January 31, 1944, and January 31, 1945, respectively; (3) whether petitioners Jack Starr and Samuel M. Starr are entitled to ordinary losses in the respective amounts of $18,390 and $30,500 in 1945 resulting from the worthlessness of loans made to another partnership called Four Starr Manufacturing Company; and (4) whether the respondent erred in failing to credit both petitioners with the proper amount of taxes paid by them for the taxable year 1944. Relative to Issue 4, petitioners have filed certificates of assessments and payments on Form 899 (Rev. *184 10.54), and the parties agree that this issue will be settled under Rule 50. General Findings of Fact Petitioners are brothers. They filed their income tax returns for the taxable years ended December 31, 1943, 1944, and 1945 with the then collector of internal revenue for the first district of Illinois. Joseph Starr, William Starr, and petitioners are all brothers. Issue 1. Partnership Income Findings of Fact On or about May 1, 1942, Samuel, Joseph, and William organized a partnership called the Starr Pen Company. This partnership only lasted until February 1943 when a new partnership by the same name was organized, consisting of Joseph with a 70 per cent interest, Jack with a 15 per cent interest, and Samuel with a 15 per cent interest. All references herein to the Starr Pen Company or partnership refer to the partnership organized on February 1, 1943, unless otherwise indicated. The accounting periods of the partnership ran from February 1, 1943, to June 30, 1943, from July 1, 1943, to January 31, 1944, and from February 1, 1944, to January 31, 1945. The partnership kept its books and filed its partnership returns (Form 1065) on an accrual basis. The business of the *185 partnership was the sale at wholesale of fountain pens and sets of fountain pens and mechanical pencils. It did not manufacture any of the merchandise which it sold. Prior to March 1943, the partnership had purchased the assets of the Conklin Pen Company, including its trade name and trade-mark. During 1943 the partnership did business under the names Conklin Pen Company and Starr Pen Company. Conklin Pen Company was a division of Starr Pen Company. Merchandise sold under the name Starr Pen Company was invoiced under that name and merchandise sold under the name Conklin Pen Company was invoiced under that name. During the taxable years, Samuel was self employed as a practicing lawyer. In 1943 maintained a law office in Chicago. During the taxable years he attended meetings of the partners of Starr Pen Company. These meetings were held to discuss the policies and methods of operation of the partnership. At the meetings Samuel gave advice to the other partners with respect to these matters. During 1942 and January 1943, Jack was employed by the partnership organized in 1942 as superintendent in charge of assembly and shipping. After he became a member of the partnership organized *186 on January 31, 1943, he continued to act as superintendent in charge of assembly and shipping until approximately April 1944. He did not handle negotiations for sales made by Starr Pen Company. In 1943 there was an acute shortage of fountain pens in the United States. On January 1, 1943, Martin King, Ruth King, Nelson J. McMahon, and Edward H. Larson, formed a partnership known as King, Larson and McMahon (hereinafter called K. L. & M.) to engage in the business of selling fountain pens at wholesale to jobbers. Each partner of K. L. & M. had a 25 per cent interest in the partnership. The office of K. L. & M. was located in Chicago. It had an organization of sales representatives with contacts throughout the United States. In 1943 it was purchasing fountain pens from Starr Pen Company. In the first week in March 1943, Joseph Starr and King met at the former's office at Starr Pen Company. At that time Joseph showed King an oversized fountain pen with a large gold nib bearing the name Conklin, a set consisting of a Conklin fountain pen and a matching mechanical pencil, and a set consisting of a thinner fountain pen with a smaller gold nib bearing the name Conklin and a matching *187 mechanical pencil. The large fountain pen was designated with the symbol 5D, the first described set with the symbol 8S, and the second described set with the symbol 5S. Joseph stated that the 5D pen had a retail list price of $5, the 8S pen and pencil set a retail list price of $8.50, and the 5S pen and pencil set a retail list price of $5. The retail list price was the amount to be paid for the item by a person purchasing it from a retail merchant. Joseph, on behalf of Starr Pen Company, discussed selling to K. L. & M. large quantities of the 5D pen, 8S pen and pencil set, and the 5S pen and pencil set at the following prices: the 5D pen at an invoice price of $1.12 1/2 for each unit, which was to be paid by check, plus a so-called "royalty" of $.60 for each unit, which was to be paid in cash, or a total price of $1.72 1/2 for each unit; the 8S pen and pencil set at an invoice price of $1.91 1/2 for each set, which was to be paid by check, plus a "royalty" of $1 for each set, which was to be paid in cash, or a total price of $2.91 1/2 for each set; and the 5S pen and pencil set at an invoice price of $1.12 1/2 for each set, which was to be paid by check, plus a "royalty" of $.60 *188 for each set, which was to be paid in cash, or a total price of $1.72 1/2 for each set. Joseph told King that K. L. & M. were to sell these pens and pen and pencil sets only to jobbing concerns. Joseph stated that K. L. & M. was to sell the 5D pen for $2.25 for each unit, the 8S pen and pencil set for $3.82 1/2 for each set, and 5S pen and pencil set at $2.25 for each set. These selling prices by K. L. & M. were determined by discounting the retail list prices 50 per cent and from the balance an additional 10 per cent. King kept McMahon and Larson advised of the discussions he had had with Joseph Starr. At approximately the end of March 1943, Joseph Starr on behalf of Starr Pen Company, and King on behalf of K. L. & M., entered into an oral agreement under which Starr Pen Company would see K. L. & M. large quantities of the 5D pen and the 8S and 5S pen and pencil sets at the prices discussed by Joseph in his meeting with King in the first week in March 1943. At some time between April 10, 1943, and April 27, 1943, Joseph Starr and King met in the former's office at Starr Pen Company. At that time Joseph and King agreed that Starr Pen Company would sell K. L. & M. quantities *189 of fountain pens designated by K. L. & M. with their symbol 225X, and sets consisting of a fountain pen and mechanical pencil designated by K. L. & M. with their symbol 4A or 4N, at the following prices: the 225X fountain pens at an invoice price of $26.50 per gross, which was to be paid by check, plus an additional amount of $36 per gross, which was to be paid with cash, or at a total price of $62.50 per gross; and the 4A and 4N pen and pencil sets at an invoice price of $43 per gross, which was to be paid by check, plus an additional amount of $72 per gross which was to be paid with cash. Early in June 1943, Joseph and King agreed that Starr Pen Company would sell K. L. & M. quantities of a Conklin fountain pen designated with the symbol 3D and given by Joseph retail list price of $2.95 and a Conklin set consisting of a fountain pen and mechanical pencil designated with the symbol 3S and given by Joseph a retail list price of $3.95. It was agreed that the 3D fountain pen and the 3S pen and pencil set would be sold to K. L. & M. at the following prices: the 3D pen at an invoice price of $.54 for each unit, which was to be paid by check, plus a "royalty" of $.50 for each unit, which *190 was to be paid in cash, or at a total price of $1.04 for each unit, and the 3S pen and pencil set at an invoice price of $.75 for each set, which was to be paid by check, plus a "royalty" of $.60 per set, which was to be paid in cash, or a total price of $1.35 for each set. It was agreed that K. L. & M. would sell the 3D pen and the 3S pen and pencil sets to jobbers at the retail list price less the customary discount of 50 per cent and 10 per cent of the remainder, or at a price of $1.33 for each 3D pen and a price of $1.78 for each 3S set. During the period between April 23, 1943, and October 21, 1943, the partnership sold and delivered merchandise to K. L. & M. under the above agreements. Every order of merchandise sold and delivered to K. L. & M. was sold under written invoices of either Starr Pen Company or Conklin Pen Company. K. L. & M. made payments of the amounts shown on the invoices as the selling prices by its checks, and the checks were received by the partnership. During the accounting periods of Starr Pen Company from February 1, 1943, to June 30, 1943, and from July 1, 1943, to January 31, 1944, K. L. & M., through King, made payments of "royalties" in cash, that *191 is to say, cash payments over and above the invoiced charges of the partnership, for merchandise sold and delivered to K. L. & M. in the total amount of $235,198.80. All of this amount except $12,000 was paid by King to Joseph directly. The remaining $12,000 was turned over to Samuel at the latter's law office by King on four different dates in sealed envelopes with instructions for Samuel to turn the envelopes over to Joseph. This was done at Joseph's request while Joseph was in New York on business. Samuel did not know the contents of the envelopes except on one occasion King told Samuel not to leave the envelope on his desk but to put it in his pocket as it contained currency. At that time King did not know that Samuel was a partner in Starr Pen Company. The dates and amounts of the 4 payments by King to Samuel were all made in 1943, as follows: April 27, $2,000; May 7, $2,500; May 14, $2,500; and May 18, $5,000. The practice which King followed in making the cash payments was as follows: checks of K. L. & M. payable to cash were prepared and signed by King and either Larson or McMahon. The checks were cashed at the bank where K. L. & M. had its account. King received currency *192 for the amounts of the checks. The currency was placed in envelopes which were then sealed. Thereafter he handed the envelopes containing the currency to Joseph with the exception of the first 4 envelopes mentioned above which were handed to Samuel. King delivered the currency to Joseph in the latter's office at Starr Pen Company or in certain restaurants in Chicago. Between April 27, 1943, and October 18, 1943, both dates inclusive, 31 different checks in round amounts ranging from $2,000 to $10,100 and totaling $222,100, were thus cashed, placed in sealed envelopes, and turned over to Joseph and Samuel in the manner described above. On December 30, 1943, a final check, No. 3314, was drawn by K. L. & M. for $13,098.80, and cash of that amount was also turned over to Joseph in the manner above described. Jack delivered to K. L. & M. most of the merchandise which Starr Pen Company sold to K. L. & M. in 1943. In that year, King telephoned him from time to time about making certain repairs. On or about October 21, 1943, King asked Joseph for an invoice from Starr Pen Company billing K. L. & M. for the amount of the cash payments over and above the invoiced charges of the partnership. *193 At this time, Starr Pen Company stopped selling merchandise to K. L. & M. under the three agreements entered into by these companies in March, April, and June 1943. King asked Joseph for such an invoice on a number of occasions after this date. The total amounts which accrued to Starr Pen Company under its invoices to K. L. & M. for the merchandise sold by the partnership during the latter's accounting periods from February 1, 1943, to June 30, 1943, and from July 1, 1943, to January 31, 1944, are set forth below. The total so-called royalties, which accrued to the partnership during the same accounting periods, are also set forth below: Total
Total Accrued
"Royalties"
Accounting
Per Invoices -
Accrued -
Period
Paid by Check
Paid by Cash
2/1/43-6/30/43
$105,111.18
$ 66,448.80
7/1/43-1/31/44
233,327.42
168,750.00
$338,438.60
$235,198.80
Early in October 1943, Joseph for Starr Pen Company, and King for K. L. & M., agreed that late in October or in November of that year, Starr Pen Company would sell 100 gross of special fountain pens bearing the name "Winchester" to K. L. & M. at an invoice price of $36 per gross, which was to be paid by *194 check, plus an additional amount of $35 per gross, which was to be paid with cash, or a total price of $71 per gross. On November 29, 1943, a check, No. 3089, of K. L. & M., was prepared payable to cash for $7,100. This check was cashed. The proceeds of the check were delivered to King and placed in an envelope. On November 29, 1943, King handed the envelope containing $7,100 in currency to Joseph in payment for the pens. On the same day, Starr Pen Company delivered 100 gross of the pens to K. L. & M. Starr Pen Company never sent K. L. & M. an invoice for this merchandise. There accrued to Starr Pen Company during its accounting period ended January 31, 1944, $7,100 from the sale of the Winchester pens which was paid in cash to Joseph for Starr Pen Company. The payments by K. L. & M. of all the invoices of the partnership, the cash payments over and above the invoiced charges of the partnership, and the cash payment of $7,100 for the Winchester pens were entered on the books of K. L. & M. as cost of merchandise purchased from Starr Pen Company. Sometime between December 1943 and April 1944 King had a conversation with Samuel in which the former told the latter that K. L. & M. *195 had made cash payments in excess of $200,000 over and above the invoiced charges on purchases of merchandise from Starr Pen Company and that K. L. & M. had been unable to obtain an invoice from Starr Pen Company billing K. L. & M. for the amount of these payments. A few days after the conversation, Samuel reported the substance of it to Jack. On February 1, 1944, Starr Pen Company was reorganized as a limited partnership. At this time, Joseph became the sole general partner and Samuel and Jack became limited partners. On January 31, 1946, the limited partnership was dissolved. At this time, Samuel and Jack each received from the limited partnership the amount shown as a credit balance in his respective capital account and additional amounts of $10,000 and $15,000, respectively, as goodwill. These additional amounts were reported by petitioners in their respective returns for 1946. The partnership returns of income of Starr Pen Company for its accounting periods from February 1, 1943, to June 30, 1943, and from July 1, 1943, to January 31, 1944, were prepared from its books and records by Bernard D. Cohn, an accountant. The cash payments of $242,298.80 ($235,198.80, plus $7,100) *196 which K. L. & M. paid the Starr Pen Company through Joseph and Samuel were not entered in the books of the partnership. Samuel's and Jack's distributive shares of the accrued cash receipts of the so-called "royalties" of Starr Pen Company of $66,448.80 for its accounting period from February 1, 1943, to June 30, 1943, and $175,850 ($168,750, plus $7,100) for its accounting period from July 1, 1943, to January 31, 1944, were as follows: Period
Samuel
Jack
2-1-43 to 6-30-43
$ 9,967.32
$ 9,967.32
7-1-43 to 1-31-44
26,377.50
26,377.50
Petitioners failed to report any part of these amounts in their respective returns for 1943 and 1944. Opinion Petitioners do not seriously contend that K. L. & M. did not pay for the merchandise purchased from Starr Pen Company a total amount of $242,298.80 in excess of the invoice price of such merchandise. Samuel testified that he could not remember having received the 4 payments totaling $12,000 but that if he did receive them, he turned them over to Joseph. King testified several times that he personally delivered the 4 envelopes to Samuel; that Joseph had requested King to do so while Joseph was in New York on business; *197 that he, King, told Samuel of Joseph's request, and that Samuel was to deliver the envelopes to Joseph upon his return to Chicago. We have no doubt that the $12,000 was turned over to Samuel by King and that Samuel in turn delivered the sealed envelopes to Joseph, and we have so found. Petitioners' main contention relative to this issue is that, if the $242,298.80 was received by Joseph, it was not received by him on behalf of the partnership and that he should have returned it all as his income. They contend that no part of the $242,298.80 is taxable to them. In the instant proceedings, the respondent determined that the so-called "royalties" were paid to Joseph on behalf of the partnership and that each petitioner was taxable on his 15 per cent interest. This determination is presumed to be correct and the burden of disproving it is upon petitioners. Louis Halle, 7 T.C. 245, affd. (C.A. 2, 1949) 175 Fed. (2d) 500. [1]
*198 We do not think petitioners have met their burden of showing that when Joseph was arranging for the so-called "royalties" he was acting only for himself and not for the partnership. King testified that he understood that all of the payments made by him were for goods purchased from the partnership. The so-called "royalties" were a part of the agreed selling prices for merchandise owned and sold by the partnership. Petitioners' testimony in these proceedings amounted to little more than a general denial. Clearly such testimony is not sufficient to overcome the presumption of correctness which attached to respondent's determination. Louis Halle, supra. We hold that the so-called royalties in the total amount of $242,298.80 were received by Joseph and Samuel Starr on behalf of the Starr Pen Company and that $66,448.80 thereof accrued to the partnership during its accounting period ending June 30, 1943, and that $175,850 thereof accrued to the partnership during its accounting period ending January 31, 1944. Each petitioner had a 15 per cent interest in the partnership. Under section 182. [2]I.R.C. 1939, each partner is required to include in his individual net income *199 his distributive share of the ordinary net income of the partnership whether or not distribution is made to him. We hold, therefore, that each petitioner should include in his net income for 1943 and 1944 15 per cent of the above amounts of $66,448.80 and $175,850, respectively. Stoumen v. Commissioner, (C.A. 3, 1953) 208 Fed. (2d) 903, affirming T.C. Memorandum Opinion, March 13, 1953, Doc. No. 26431 [12 TCM 267,]. Issue 2. Jack's Salaries Findings of Fact Jack was employed by the partnership called Starr Pen Company that was organized on or about May 1, 1942, but was not a member of that partnership. Jack was a member of the new partnership of the same name that was organized on February 1, 1943. He had charge of assembly and shipping and had a drawing account with the partnership. In his return for 1943, Jack included under item 1 as salary, wages, *200 and compensation for personal services from Starr Pen Company the amount of $3,129.71. He also included under item 9 the amount of $31,124.27 as his distributive share of the income from the partnership of Starr Pen Company. In the partnership return of income for the period beginning February 1, 1943, and ending June 30, 1943, the net income of $194,495.09 was divided among the partners in Schedule J of the return as follows: Joseph and Irene Starr
$135,246.56
Samuel M. Starr
28,124.26
Jack Starr
31,124.27
Total
$194,495.09
In the statement attached to the deficiency notice mailed to Jack, the respondent added $9,833.39 as partnership income to the net income reported by Jack in his return for 1943 and explained the addition as follows: "It is held that you were a partner of the Starr Pen Co. and that your share of the taxable net income of that company for its taxable year February 1, 1943 to June 30, 1943 was $40,957.66. You reported in your return taxable net income from this source of $31,124.27. Your net income accordingly has been increased by the difference of $9,833.39. Computation is as follows: Starr Pen Co.
Taxable net income as dis-
closed by its return (From
1065) for the taxable year
February 1, 1943 to June
30, 1943
$194,495.06
Add: Additional income not
reported in the return
65,556.00
Net income adjusted
$260,051.06
Less: Salaries of partners
7,000.00
Balance distributable to part-
ners
$253,051.06
Your share, 15% of $253,051.06
37,957.66
Salary
3,000.00
Total taxable to you in 1943
$ 40,957.66"
*201 In the same statement, the respondent made similar determinations for 1944 and 1945 wherein he deducted from the net income adjusted of the partnership, salaries of partners in the amount of $11,600 for 1944 and $14,400 for 1945 in arriving at the balance distributable to partners. He then took 15 per cent of the balance distributable to partners and added thereto a salary of $4,600 in 1944 and a salary of $2,400 in 1945 in determining the total partnership income taxable to Jack in 1944 and 1945, respectively. Opinion Petitioner Jack Starr has not shown that any error was committed as to salary income either by himself in filing his return for the year 1943 or by the respondent in his determination that petitioner received a salary for 1943, 1944, and 1945 from the Starr Pen Company of $3,000, $4,600, and $2,400, respectively. He was unable to explain why in Schedule J of the partnership return for the period ending June 30, 1943, his share of the partnership net income was stated at $31,124.27, whereas Samuel's share was only $28,124.26. When asked if the $31,124.27 was his salary and a share of the profits, he answered: "I don't know. Mr. Cohn made up our returns, and I *202 never questioned him on it. He took care of the books and made our returns up." Although Bernard Cohn was one of the witnesses for petitioners, he was never interrogated in regard to salaries paid Jack either by the partnership organized on or about May 1, 1942, or the one organized on February 1, 1943. As to these issues, we hold that no error has been committed either by petitioner Jack Starr or by the respondent. Issue 3. Loans to Four Starr Manufacturing Company Findings of Fact About the middle of 1943, William Starr, his wife Blossom Starr, William Friedman, and his wife Jean Friedman, formed a partnership, Four Starr Manufacturing Company, to engage in the business of manufacturing toys. On or about January 15, 1945, William and his wife acquired the interests of the Friedmans in the partnership. Neither Samuel nor Jack was a partner in Four Starr Manufacturing Company or received any distribution of profits of that company. At different times during the period when Four Starr Manufacturing Company operated, Samuel and Jack made loans to that company in the total amounts of $30,500 and $18,390, respectively. The company issued no notes for the loans and paid no *203 interest on them. It was orally agreed at the time the loans were made that at the end of 3 years petitioners would share equally in the profits of the business, if any. At the end of the 3-year period, the four above-mentioned partners of Four Starr Manufacturing Company had the option of continuing the arrangement that would have been in effect for the past 3 years, or to pay off the loans. On November 30, 1945, the plant, and books and records of the Four Starr Manufacturing Company were destroyed by fire and it ceased doing business. No part of the loans was repaid. In his income tax return for 1945, Jack claimed a loss of $18,390 for worthlessness of the loans made by him to Four Starr Manufacturing Company. In his income tax return for 1946, a year not before us, Samuel claimed a loss of $30,500 for worthlessness of the loans made by him to Four Starr Manufacturing Company. In both returns the advances were described as a "business loan." Respondent determined that the loans became worthless in 1945 and that the losses resulting therefrom were nonbusiness bad debts deductible to the extent provided in section 23(k)(4) of the Internal Revenue Code of 1939. The losses from *204 the worthlessness of these loans were not incurred in any trade or business of either petitioner. Opinion Petitioners concede they were not partners in the Four Starr Manufacturing Company. The loans which they made to this company bore no interest as such. In lieu of interest, they were to share in the profits of the company, if any. But before the 3-year period had run, the entire plant of the company was destroyed and petitioners' loans to the company became worthless. It is not too clear from the record whether petitioners are claiming deductions for these loans (which became worthless in 1945) under section 23(e), or under section 23(k)(1) of the Internal Revenue Code of 1939. [3] In the pleadings they pray that the amounts be allowed as a "business bad debt." In their brief they say the only question is "whether the loss shall be classified as a business loss." They cite in support of their contention the single case of Vincent C. Campbell, 11 T.C. 510. This case held that certain loans which became worthless were business bad debts rather than nonbusiness bad debts where they were made by certain individuals to one of 12 corporations which they had organized *205 and which they owned and operated.
*206 It is clear that in any event petitioners are not entitled to any deduction under section 23(e). The loans to Four Starr Manufacturing Company established a debtorcreditor relationship for any deduction for the worthlessness thereof can be had only under section 23(k) and not under section 23(e) for the reason that the two subsections (e) and (k) are mutually exclusive. Spring City Foundry Co. v. Commissioner, 292 U.S. 182 (1934); Dominick J. Salomone, 27 T.C. 663, 668-669. The respondent determined that the losses resulting from the worthlessness of the loans were nonbusiness bad debts and, under section 23(k)(4), "shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months." This determination is prima facie correct and the burden of proof is on petitioners to demonstrate error in such determination. Darwin O. Nichols, 29 T.C. - (Mar. 21, 1958). This they have failed to do. Petitioners have not shown that they were in the business of promoting, organizing, owning, operating, and lending money to various organizations, as was the situation in Vincent C. Campbell, supra. *207 During the time that the loans made by petitioners to the Four Starr Manufacturing Company were in effect and prior to the time such loans became worthless, both petitioners were limited partners of Starr Pen Company and, in addition to that, Samuel was practicing law and Jack was the superintendent at the plant of the Four Starr Manufacturing Company. The business of that company was the business of the partners of Four Starr Manufacturing Company and not petitioners' business. We hold that the debts of $30,500 and $18,390 are deductible only as nonbusiness bad debts under section 23(k)(4), I.R.C. 1939. Dominick J. Salomone, supra; Darwin O. Nichols, supra. Decisions will be entered under Rule 50. Footnotes
1. It may be noted that in his determination in these proceedings the respondent did not determine that K. L. & M. had paid Joseph on behalf of the partnership the $7,100 for the Winchester pens, and that the respondent had allocated the $235,198.80 between the two accounting periods in the amounts of $65,556 and $169,642.80 instead of the amounts found by us of $66,448.80 and $168,750, respectively. Of course, to the extent that respondent contends the facts are different from those determined by him, the burden is on the respondent to show that difference. We hold that the respondent has met his burden as to the $7,100 and also as to the proper allocation between the two accounting periods.↩
2. SEC. 182. TAX OF PARTNERS. In computing the net income of each partner, he shall include, whether or not distribution is made to him - * * *
(c) His distributive share of the ordinary net income or the ordinary net loss of the partnership, computed as provided in section 183(b).↩
3. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; or (2) if incurred in any transaction entered into for profit, though not connected with the trade or business; * * *
(k) Bad Debts. - (1) General rule. - Debts which become worthless within the taxable year; * * * This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. * * *
(4) Non-business debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt * * * other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩